[Civ. No. 11917.   First Dist., Div. Two.   Apr. 20, 1942.]

EMMA HEDLUND, Respondent, v. SUTTER MEDICAL SERVICE COMPANY (a Corporation), Appellant.

328

Hadsell, Sweet, Ingalls & Lamb and Hadsell, Sweet, Ingalls & Carroll for Appellant.

A. D. Ericksen, Johnson & Harmon and Wm. H. Henderson for Respondent.

DOOLING, J. pro tem.—This is an appeal by Sutter Medical Service Company from a judgment against it and in favor of plaintiff entered following the verdict of a jury. The appellant is the owner and operator of the Sutter Hospital in San Francisco. The defendant S. Nicholas Jacobs is a licensed physician and the president of appellant company. The evidence shows that a group of doctors known as "Sutter Hospital Group of Doctors" have their offices on the first floor of the building occupied by the Sutter Hospital. The hospital and the group of doctors have a common bank account and a common bookkeeping system, but it is appellant's contention that they operate entirely independently, the doctors belonging to the group being all employed by Dr. Jacobs as president of the group, paying rent to the appellant company for the office space occupied by them in the hospital building, and being paid for their services from the receipts of the group by checks on the common bank account. The testimony of Dr. John E. Morgan, another defendant who was actually in charge of plaintiff's treatment, was sufficient to cast grave doubt upon appellant's claim that this was the actual arrangement. Dr. Morgan testified that he was employed at a monthly salary by Dr. Jacobs "as a resident physician at the Sutter Hospital," that at the time of his employment Dr. Jacobs said nothing to him about the group of doctors and spoke only of his taking a position as resident physician, and that he knew very little about the

group of doctors until the day that he was called to the witness stand. However, we do not find it necessary to inquire further into the intricacies of the relationship between the appellant and the Sutter Hospital Group of Doctors for the reason that we are satisfied that the verdict and judgment against appellant can well be rested upon the doctrine of estoppel.

Plaintiff, who is a waitress belonging to the Waitresses' Union in Oakland, had long been a sufferer from asthma. On September 28, 1939, she went to the Sutter Hospital. Over the door of the building she saw the words "Sutter Hospital." She had no particular doctor in mind. She went to the desk in the reception room and the lady at the desk asked her what she wanted. She told her: "I was troubled with asthma and I wanted a general examination." The receptionist took her history and she told the receptionist that "I was troubled with asthma and I was advised to come to the Sutter Hospital because my sister advised me to go there and have an examination and see if they could find anything that would help me. So she ordered me in to Dr. Morgan." Plaintiff had never met Dr. Morgan before and did not ask to see him or any particular doctor. Before she was taken to Dr. Morgan's office the receptionist gave her a bill for $26.50 and she went to the office and paid that amount to the cashier. Dr. Morgan after an examination of the plaintiff and the taking of an X-ray sent her to Miss Lockwood, a technician in the hospital building, for an allergy test. It was as a result of this test that she suffered the injury to her arm for which the jury awarded her a verdict against appellant. Even after her arm became seriously swollen and inflamed nothing was said to her about the Sutter Hospital Group of Doctors, and on the day following her examination Dr. Jacobs admitted her to the Sutter Hospital as a bed patient for free treatment of her injured arm.

The trial judge gave an instruction on estoppel as against appellant. The facts above recited would justify a finding by the jury that appellant was estopped to deny that Miss Lockwood in giving the allergy test was its employee. (*Donnelly v. San Francisco Bridge Co.*, 117 Cal. 417 [49 Pac. 559]; *Lowmiller v. Monroe, Lyon & Miller, Inc.*, 101 Cal. App. 147 [281 Pac. 433, 282 Pac. 537]; *Hannon v. Siegel-Cooper Co.*, 167 N. Y. 244 [60 N. E. 597, 52 L. R. A. 429]; *Adelphia Hotel Co. v. Providence Stock Co.*, 277 Fed. 905;

*Standard Oil Co.* v. *Gentry,* 241 Ala. 62 [1 So. (2d) 29]; *Augusta Friedman's Shop* v. *Yeates,* 216 Ala. 434 [113 So. 299]; *Manning* v. *Leavitt Co.,* 90 N. H. 167 [5 A. (2d) 667]; *Fields, Inc.* v. *Evans,* 36 Ohio App. 153 [172 N. E. 702]; *Christiansen* v. *Fantle Bros., Inc.,* 56 S. D. 350 [228 N. W. 407]; *Maloney Tank Mfg. Co.* v. *Mid-Continent Petroleum Corp.,* 49 F. (2d) 146; *Rhone* v. *Try Me Cab Co.,* 65 F. (2d) 834.) The basis of the rule in tort cases is well stated in *Hannon* v. *Siegel-Cooper Co., supra:* "It may very well be that where the duty, the violation of which constitutes the tort sued for, springs from no contract with, nor relation to, the principal, a party could not be estopped from denying that the wrongdoer was his agent, even though he held him out as such. In such case the representation of the principal would be no factor in producing the injury complained of. But, whenever the tort consists of a violation of a duty which springs from the contract between the parties, the ostensible principal should be liable to the same extent in an action *ex delicto* as in one *ex contractu.*" We cannot agree with appellant that under the facts the jury was not entitled to find that plaintiff, relying upon appearances for which appellant was responsible, believed that she was contracting for medical services with the appellant.

The facts constituting the estoppel could be proved without pleading them in the complaint, since the issue was first raised by the answer of appellant. (*Wilson* v. *Grey,* 49 Cal. App. (2d) 228 [121 P. (2d) 514], and cases there cited.)

It is true that appellant could not lawfully practice medicine, but this fact should not avail it in an action of this character. It either did contract, or led appellant to believe that it was contracting, with her for medical services. The same question was disposed of in *Hannon* v. *Cooper-Siegel Co., supra,* where the court said:

"The public health law, by section 164, makes it a misdemeanor for any person to practice, or to hold himself out to the public as practicing dentistry . . . without being licensed to practice as such . . . and it would seem that the action of the defendant, in assuming to carry on the business of dentistry, was illegal and *ultra vires.* But, though it was beyond the corporate powers of the defendant to engage in the business, this does not relieve it from the torts of its servants committed therein (*Bissell* v. *Michigan, etc. Railroad Co.,* 22 N. Y. 258), and the unanimous affirmance of the appellate

division is conclusive to the effect that it either practiced dentistry or held itself out as practicing dentistry."

The case of *Pilger* v. *City of Paris Dry Goods Co.,* 86 Cal. App. 277 [261 Pac. 328], announcing a contrary rule, was expressly disapproved in *Inderbitzen* v. *Lane Hospital,* 124 Cal. App. 462 [12 P. (2d) 744, 13 P. (2d) 905], and as pointed out in that case both before and since the decision of the Pilger case hospitals have been held liable in this state for tortious acts of physicians where the hospital had contracted to furnish medical services. (*Brown* v. *La Societe Francaise,* 138 Cal. 475 [71 Pac. 516] ; *Bowman* v. *Southern Pacific Co.,* 55 Cal. App. 734 [204 Pac. 403] ; *Bellandi* v. *Park Sanitarium Assn.,* 214 Cal. 472 [6 P. (2d) 508] ; *Criss* v. *Angelus Hospital Assn.,* 13 Cal. App. (2d) 412 [56 P. (2d) 1274].) Many cases to like effect from other jurisdictions are collected in the Inderbitzen case at page 466 and to these cases may be added the following since decided : *Edwards* v. *West Texas Hospital* (Tex. Civ. App.), 89 S. W. (2d) 801; *Giusti* v. *C. H. Weston Co.,* 165 Ore. 525 [108 P. (2d) 1010] ; *Hansch* v. *Hackett,* 190 Wash. 97 [66 P. (2d) 1129].

▊ The useful legal fiction by which everyone is presumed to know the law, relied upon by the court in *Iterman* v. *Baker,* 214 Ind. 308 [15 N. E. (2d) 365], to reach a different conclusion, becomes a medium of injustice when applied in a case of this character. The maxim "No one can take advantage of his own wrong" (Civ. Code, § 3517) would seem to be more applicable. The restriction upon the practice of medicine is for the protection of the public, including plaintiff in this case, and not at all for the protection of one who wrongfully engages in its practice. The parties are in no sense *in pari delicto.* The rule properly to be applied in such cases is couched in the following language in the Restatement of the Law of Contracts, volume II, section 601 :

"If refusal to enforce or rescind an illegal bargain would produce a harmful effect on parties for whose protection the law making the bargain illegal exists, enforcement or rescission, whichever is appropriate, is allowed."

Rescission would not afford plaintiff adequate relief for the injury done her. The return of her $26.50 paid for the examination would be a poor substitute for the $3,750 damages allowed her in this case for her injuries. The rule above quoted from the Restatement has more than once found application in the decisions of our courts. (*Eberhard* v. *Pacific*

*Southwest Loan & Mortgage Corp.*, 215 Cal. 226, 228 [9 P. (2d) 302]; *Bliss* v. *California Cooperative Producers*, 23 Cal. App. (2d) 245 [72 P. (2d) 885]; *Western Oil etc. Co.* v. *Venago Oil Corp.*, 218 Cal. 733, 745 [24 P. (2d) 971, 88 A. L. R. 1271]; *Rossi* v. *Jedlick*, 115 Cal. App. 230, 235 [1 P. (2d) 1065]; *Savings Bank* v. *Burns*, 104 Cal. 473, 480 [38 Pac. 102].) To refuse to apply it in this case would permit one who would otherwise be bound by a tort liability to escape that liability on the sole ground that in the commission of the tort it was violating a law enacted not for its, but for plaintiff's protection.

■ Appellant suggests, without citation of any authority, that, if the appellant hospital is held on the theory of estoppel to deny that Miss Lockwood was its employee, the verdict in favor of Dr. Jacobs is fatally inconsistent with the verdict against the hospital in view of Dr. Jacobs' and Miss Lockwood's testimony that she was Dr. Jacobs' employee. Appellant doubtless has in mind the principle enunciated in *Bradley* v. *Rosenthal*, 154 Cal. 420 [97 Pac. 875, 129 Am. St. Rep. 171], that where master and servant are jointly sued for the alleged negligence of the servant alone, which the master did not direct and in which he did not participate, a verdict in f vor of the servant *"ex proprio vigore* relieves the principal of responsibility and may be availed of by the principal for that purpose." This case does not fall into that pattern. Here the act of negligence was Miss Lockwood's not Dr. Jacobs', and if Dr. Jacobs and appellant hospital were liable they were both liable under the doctrine of respondeat superior. The hospital's liability was in no sense dependent upon any act of Dr. Jacobs and vice versa. Miss Lockwood was not a party defendant and was not exonerated by the jury. The rule applying to joint tort feasors generally is that judgment in favor of one joint tort feasor is not a bar to a recovery against the other.

"Neither is a judgment in favor of one joint tort-feasor, evidence in favor of or a bar to an action against another, except where the liability of the latter is purely derivative or he is entitled to indemnity from the other." (Freeman on Judgments, 5th ed., vol. 2, p. 1213.)

The question was elaborately discussed by the Supreme Court of the United States in *Bigelow* v. *Old Dominion Copper M. & S. Co.*, 225 U. S. 111 [32 S. Ct. 641, 56 L. Ed. 1009], and the rule declared that a judgment in favor of one joint

tort feasor is not a bar to a recovery against the other except "where the liability of the defendant is altogether dependent upon the culpability of one exonerated in a prior suit, upon the same facts, when sued by the same plaintiff. . . . The unilateral character of the estoppel of an adjudication in such cases is justified by the injustice which would result in allowing a recovery against a defendant for conduct of another, when that other has been exonerated in a direct suit. The cases in which it has been enforced are cases where the relation between the defendants in the two suits has been that of principal and agent, master and servant, or indemnitor and indemnitee.''

The quotation from Freeman and the Bigelow case deal with the effect of a judgment in favor of one joint tort feasor when the other is later sued in a separate action, but it has been held in California that the principle is no different where the two are joined in one action. Since the liability of joint tort-feasors is joint and several, and since neither has a right of contribution from the other, it is settled that one joint tort-feasor against whom a judgment was rendered cannot complain that the other was erroneously exonerated in the same action. ''The appellant, however, cannot take advantage of an error in favor of his codefendants. The liability is joint and several, and if the defendant is liable, he cannot complain of the verdict in favor of his codefendants who are equally liable.'' (*Talcott Land Co.* v. *Hershiser,* 184 Cal. 748, 756 [195 Pac. 653].) Even in the case of master and servant, where the liability arises solely by reason of the servant's conduct, if the master directed the servant's tortious act and is thus independently liable, he may be held although the servant is exonerated. (*Benson* v. *Southern Pacific Co.,* 177 Cal. 777 [171 Pac. 948].) We recognize that in the Benson case no verdict was returned for or against the servant, but the case was treated by the court as one in which the failure to return a verdict was tantamount to a verdict in the servant's favor. It was cited to this effect in *Blackwell* v. *American Film Co.,* 189 Cal. 689, 698 [209 Pac. 999].

We conclude that the judgment in favor of Dr. Jacobs cannot be taken advantage of by the appellant on this appeal. (*Ohlson* v. *Frazier,* 2 Cal. App. (2d) 708, 715 [39 P. (2d) 429]; *Jennings* v. *Day,* 7 Cal. App. (2d) 555, 557

[46 P. (2d) 193]; *Bezera* v. *Associated Oil Co.*, 117 Cal. App. 139, 142 [3 P. (2d) 622]; *Blackwell* v. *American Film Co., supra; Talcott Land Co. v. Hershiser, supra.)*

The same result can be as well reached in this case in another fashion. If appellant hospital is estopped to deny that Miss Lockwood was its employee in administering the tests to plaintiff in this action, it would seem to be equally estopped to assert against the plaintiff that Dr. Jacobs was Miss Lockwood's employer.

The verdict finds support in the evidence. Plaintiff testified that Miss Lockwood, after scraping her left arm in twenty-four places, dropped a solution onto each abrasion from a dropper. As soon as the liquid touched the arm it commenced to have a burning sensation. Plaintiff said: "Oh, my God, nurse, it is burning. What are you doing, putting acid in or something, it is burning something terrible." It was a sharp burning, just as if you put your hand in a stove. Plaintiff complained of the burning sensation when the first drop was applied but Miss Lockwood continued to apply the solution, although plaintiff continued to complain, until it had been applied to all twenty-four abrasions. After the liquid had been applied to all twenty-four scratches a different powder, for separate food tests, was put on each scratch. The arm swelled up and became very red and painful. Miss Lockwood then proceeded to scrape the right arm and applied different liquids, each from a small phial, to the abrasions on that arm. There was no sensation of burning in the right arm and no untoward developments in that arm from the application of the liquids. Plaintiff demanded that something be done for the left arm to prevent possible infection from her coat sleeve and Dr. Morgan was called in and directed Miss Lockwood to bandage the arm. The arm was so painful that night that plaintiff got little sleep and it was still burning, uncomfortable, red and very swollen the next morning. The abrasions were all "kind of greenish and pus in these openings." The plaintiff returned to the hospital the next day and Dr. Morgan and Dr. Jacobs examined her arm. Dr. Jacobs said: "If anything does happen to your arm and you are not in the hospital, we are not responsible, but we will admit you to the hospital free of charge." They put her to bed in the hospital immediately. After two or three days in the hospital the swelling and pain in the arm subsided but the abrasions "were red and yellow and green." She asked

Dr. Morgan while she was in the hospital what had happened to her arm and Dr. Morgan said that he did not know. As a result of the injury to her arm there are small scars where the abrasions were made which become red when plaintiff gets warm or when she is not feeling well. Since waitresses are required to work in short-sleeved uniforms this has resulted in its being impossible for her to get any but casual employment at her trade.

Miss Lockwood testified that the liquid applied to the abrasions on the left arm was tenth-normal sodium hydroxid which is admittedly standard for such tests. Dr. Twain, an expert produced by plaintiff, testified that such a solution is not harmful to the human body, but that sodium hydroxid is a caustic and in stronger solution will destroy the tissues. He further testified that you seldom get a reaction from an allergy test in less than an hour and very seldom get any severe reactions from the skin-scratch tests of the kind made upon plaintiff's left arm, and that in the performance of the test you might get a very slight burning, but definitely would not get an intense burning. Dr Tainter, testifying for appellant, stated that if a strong solution of sodium hydroxid was placed on a scratch pain would be manifest in "ten seconds at the most, maybe before," but that there would be no pain from a tenth-normal solution.

This evidence is ample, if believed by the jury to support a finding that some corrosive liquid was applied to plaintiff's left arm resulting in the injuries which she suffered.

Dr. Twain on cross-examination testified that you might in an extreme case get a reaction from food tests which would result in an arm condition such as plaintiff suffered. This admission would not prevent the jury from finding for plaintiff. Plaintiff testified that the extreme burning sensation commenced with the application of the first drop of the solution and before any powders were applied. Her arm became painful and inflamed immediately. By the time the powders were put on "I don't really know the reaction because everything was burning"; and when asked if the burning increased when the powder was put on she replied: "I don't know. I think it remained the same." It was for the jury to decide whether plaintiff suffered her injuries from the application of a harmful solution, or from an unusual but natural reaction to a properly applied test.

■ Appellant complains that Dr. Twain was permitted to testify that he had never seen anything like the condition of plaintiff's arm as a result of allergy tests. Assuming that it was error to allow this testimony we cannot find on the record that prejudice resulted. Dr. Tainter, appellant's expert, when asked if the reaction suffered by plaintiff in her left arm could have been caused by a proper allergy test answered: "Yes, that sort of reaction is caused by an occasional—fortunately uncommon, not very usual, allergy reaction."

Dr. Twain was also allowed to testify that when he saw plaintiff's arm, "I naturally came to the conclusion that something was not proper . . . that something was wrong, something had gone wrong." While this testimony may have gone beyond the limits allowed to an expert witness (*Hurwit* v. *Prudential Insurance Co.*, 45 Cal. App. (2d) 74 [113 P. (2d) 691]) Dr. Twain testified fully on the proper manner of giving skin tests for allergy generally and the effects to be expected from tests properly and improperly given. The only question of negligence submitted to the jury was whether the "condition resulted from the application of too strong a solution of sodium hydroxid or some other corrosive substance to plaintiff's arm." The court in this respect also instructed the jury: "If you find from the evidence that Miss Lockwood . . . used the fluid that she testified that she used—that is, one-tenth normal sodium hydroxid, then your verdict must be against plaintiff and in favor of defendants." It thus appears that the jury must have found that Miss Lockwood used some corrosive and harmful liquid instead of one-tenth normal sodium hydroxid. In arriving at this conclusion they must have believed plaintiff's testimony that her arm started to burn violently when the liquid was first applied as well as the testimony given both by appellant's expert, Dr. Tainter, and Dr. Twain, that there would be no painful sensation from the use of a one-tenth normal solution of sodium hydroxid. This was the ultimate question decided by the jury and in deciding it they were instructed that they must weigh "the reasons given by one (expert) against those of another" and "should consider such expert opinion and should weigh the reasons, if any, given for it." A similar instruction was held to cure the error in the admission of expert testimony in *Hurwit* v. *Prudential Insurance Co., supra.*

Appellant complains of several instructions:

1. The instruction on estoppel. This has been sufficiently covered and we conclude that the giving of the instruction was proper.

2. An instruction that "it is the duty of a hospital to exercise ordinary care to furnish to the attendants of a patient suitable supplies, equipment and facilities commensurate with the requirements of the case. . . ." The instruction was technically correct. (*Payne* v. *Santa Barbara Cottage Hospital*, 2 Cal. App. (2d) 270 [37 P. (2d) 1061].) Taken in connection with the other instructions the jury must have understood this instruction to be applicable only if they found first that plaintiff was a patient of the hospital, or that the hospital was estopped to deny that fact, and second that the liquid supplied for use on her as patient was harmful and not innocuous. So limited the instruction was proper.

3. An instruction on the factors to be considered by the jury in determining whether the doctors and nurses in charge of plaintiff were employees of the hospital. We find no error therein.                                                                \

It is claimed that the complaint did not state a cause of action against appellant. Any defect in the complaint, if such existed, was cured by the conduct of appellant at the trial. Counsel by trying the issue of liability of appellant without objection waived any defect in the complaint. (*Reed* v. *Parra*, 203 Cal. 430 [264 Pac. 757]; *Say* v. *Barber*, 202 Cal. 679 [262 Pac. 312]; *Pasquale* v. *Pasquale*, 219 Cal. 408 [27 P. (2d) 76]; *Slaughter* v. *Goldberg, Bowen & Co.*, 26 Cal. App. 318 [147 Pac. 90].)

The trial judge on motion for new trial reduced the judgment from $5,000 to $3,750. This amount is patently not excessive.

Defendants Morgan and Jacobs have appealed from an order striking out their cost bill. Subdivision b of section 1032, Code of Civil Procedure, provides: "When there are several defendants in any action mentioned in subdivision (a) of this section, not united in interest, and making separate defenses by separate answers, and plaintiff fails to recover judgment against all, the court must award costs to such of the defendants as have judgment in their favor." While all defendants were represented by the same attorneys, they filed separate answers; and they were not united

in interest since the liability of each depended on the claimed negligence of Miss Lockwood, each could only be held liable on the theory that he was bound by Miss Lockwood's tortious conduct and the relation of each to Miss Lockwood was distinct and different from the others.

The language of the section is mandatory and we conclude that appellants Morgan and Jacobs are entitled to their costs. The case of *Naify* v. *Pacific Indemnity Co.*, 11 Cal. (2d) 5, 13 [76 P. (2d) 663, 115 A. L. R. 476], dealt with the question of costs on appeal, not trial costs, and did not purport to construe the effect of the code section above quoted.

The judgment is affirmed with costs to respondent Hedlund.

The order striking the cost bill is reversed and the trial court is directed to tax the costs pursuant to plaintiff's motion on file; appellants Morgan and Jacobs to have their costs on appeal excluding therefrom any portion of the cost of procuring the reporter's transcript.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing was denied May 20, 1942, and appellant's petition for a hearing by the Supreme Court was denied June 18, 1942.